1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10 | UNITED STATES OF AMERICA,

NO. CV24-909

11 |     Plaintiff,

12 |     v.

**VERIFIED COMPLAINT
FOR FORFEITURE *IN REM***

13 | APPROXIMATELY 149 LOTS OF
14 | STAMPS AND OTHER COLLECTIBLE
ITEMS ASSOCIATED WITH INVOICE
15 | NUMBERS 33736, 33767, 33786, 33801,
AND 33942, SEIZED FROM ROBERT A.
16 | SIEGEL AUCTION GALLERIES, INC.,

17 |     Defendants.

18
19

20   COMES NOW the United States, by and through its undersigned counsel, and

21 alleges:

22      I.   NATURE OF THE ACTION

23   1.  This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C.

24 § 981(a)(1)(C) for forfeiture of approximately 149 lots of stamps and other collectible

25 items that constitute or are derived from proceeds traceable to a violation of specified

26 unlawful activity as defined in 18 U.S.C. § 1956(c)(7), including but not limited to Mail

27

Verified Complaint for Forfeiture *in Rem* - 1
*United States v. Approximately 149 Lots of Stamps.*

Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343), and Conspiracy to Commit Mail and Wire Fraud (18 U.S.C. § 1349).

2.      This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) for forfeiture of property that is involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Conspiracy to Commit Money Laundering), or any property traceable to such property.

## II.      PLAINTIFF AND DEFENDANT *IN REM*

3.      The plaintiff is the United States of America (the "Plaintiff" or "Government" or "United States").

4.      The defendant consists of approximately 149 lots of stamps and other collectible items associated with invoice numbers 33736, 33767, 33786, 33801, and 33942, redacted copies of which are appended hereto as Attachment 1 and incorporated by reference, seized by the Federal Bureau of Investigation (FBI) from Robert A. Siegel Auction Galleries, Inc., on or about February 1, 2024 (the Defendant Property).

5.      Pursuant to a forfeiture seizure warrant issued in the Western District of Washington, Cause No. MC24-006, and executed on February 1, 2024, the FBI took custody of the Defendant Property. The Defendant Property is currently in a special climate-controlled environment in the physical possession of Robert A. Siegel Auction Galleries, Inc., where it will remain until the United States Marshals Service executes the Warrant of Arrest *in Rem*, issued by the Court.

## III.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and has jurisdiction over an action for forfeiture under 28 U.S.C. §§ 1355(a) and (b).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

Verified Complaint for Forfeiture *in Rem* - 2
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.     Pursuant to 18 U.S.C. § 981(f), all right, title, and interest in the Defendant Property vests in the United States at the time of the acts giving rise to the forfeiture.

9.     Pursuant to Supplemental Rule G(2)(f), facts in support of a reasonable belief that the United States will be able to meet its burden of proof at trial are as follows and have been verified by the attached Verification of FBI Special Agent Andrew Cropcho.

10.    As provided in Supplemental Rule G(3)(b)(i), the Clerk of Court is required to issue a warrant to arrest the Defendant Property if it is in the government's possession, custody, or control. As such, the Court will have *in rem* jurisdiction over the Defendant Property when the accompanying Warrant of Arrest *In Rem* is issued, executed, and returned to the Court.

## IV.    SUMMARY OF BASES FOR FORFEITURE

11.    The United States alleges that the Defendant Property was involved in transactions and attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957 (Money Laundering) and 1956(h) (Conspiracy to Commit Money Laundering) and constitutes, or was derived from, proceeds traceable to violations of 18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud) and 1349 (Conspiracy to Commit Mail and Wire Fraud). The Defendant Property is, therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

12.    The Defendant Property was purchased with funds swindled from victims, including at least one victim in the Western District of Washington, through various methods, including law enforcement impersonation fraud (Phase 1) and romance fraud (Phase 2). These methods are described in more detail herein. The funds were laundered through multiple financial accounts in the names of individuals and entities before being used to purchase the Defendant Property. Ultimately, though the funds were defrauded from multiple victims and traveled different paths, they arrived at the same destination.

Verified Complaint for Forfeiture *in Rem* - 3
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13.     These fraud proceeds were deposited, in the form of cashier's checks, into financial accounts of the Robert A. Siegel Auction Galleries, Inc. (the Gallery).

14.     The Gallery is an auction company located in New York, which conducts auctions for "lots" of collector stamps. When a bidder wins an auction for a lot of stamps, the Gallery issues an invoice for payment for that lot or lots, which identifies the specific lot number(s), descriptions of the items in the lot(s), and prices. When payments are made toward an invoice, those payments are also reflected on the invoice.

15.     Three buyers located in India, designated herein as Buyer 1, Buyer 2, and Buyer 3, won auctions for the approximately 149 lots of stamps comprising the Defendant Property. The Gallery issued the following invoice numbers for the lots: 33767 [Buyer 1], 33736 [Buyer 2], 33801 [Buyer 2], 33786 [Buyer 3], and 33942 [Buyer 3]. The total payment due on the five invoices was $1,383,473. Once the invoices were paid in full, the Gallery intended to send the stamps to the buyers.

16.     More than $1,000,000 of payments applied to these five invoices for the purchase of the Defendant Property were criminal proceeds defrauded from identified victims. Most of these victims have been located and interviewed.

17.     Victims of law enforcement imposter fraud (Phase 1) were conned into depositing cashier's checks made out to the Gallery directly into the Gallery account or into sending cashier's checks made out to romance fraud victims. The law enforcement impersonators falsely led the Phase 1 Victims to believe their funds would be returned to them after the purported legal issue was resolved.

18.     Some law enforcement imposter fraud victims (Phase 1) sent cashier's checks to romance fraud victims (Phase 2). The Phase 2 Victims deposited those checks, purchased cashier's checks payable to the Gallery, and deposited the new cashier's checks into the Gallery account. The romance scammers falsely led the Phase 2 Victims to believe they were assisting with legitimate money transfers, rather than being tricked into helping launder proceeds defrauded from the Phase 1 Victims.

Verified Complaint for Forfeiture *in Rem* - 4
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

19.     In some instances, funds used by Phase 2 Victims to purchase cashier's checks payable to the Gallery were defrauded from more than one victim.

20.     Phase 1 (law enforcement imposter fraud) Victims are referred to herein as "Victim 1," "Victim 2," *etc.*, and Phase 2 (romance fraud) Victims, are referred to as "Alpha," "Bravo," *etc.*

**Phase One Victims**

21.     The 18 victims of Phase 1, whose fraudulently obtained funds were deposited into the Gallery account, either directly or via Phase 2 Victims, are identified in **Table 1**. Victim 1 resides in the Western District of Washington.

| PHASE ONE VICTIMS | |
|---|---|
| **Initials** | **Designator** |
| WM | Victim 1 |
| JM | Victim 2 |
| GR | Victim 3 |
| DF | Victim 4 |
| HJ | Victim 5 |
| EB | Victim 6 |
| MS | Victim 7 |
| IR | Victim 8 |
| SiH | Victim 9 |
| CM | Victim 10 |
| MH | Victim 11 |
| DeO | Victim 12 |
| HG | Victim 13 |
| DO | Victim 14 |
| JH | Victim 15 |
| JO | Victim 16 |
| DS | Victim 17 |
| BL | Victim 18 |

**Table 1**

**Phase One Victim Funds Deposited Directly to Gallery Account**

22.     Two law enforcement imposter fraud victims (Phase 1) purchased cashier's checks payable to the Gallery and deposited those checks into the Gallery account. Most

Verified Complaint for Forfeiture *in Rem* - 5
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of the funds from these cashier's checks were credited to the invoices for the Defendant Property, as reflected in **Table 2**. Victim 2 deposited a $199,500 cashier's check into the Gallery Account, of which, $149,500 was applied to invoices for purchase of the Defendant Property. All funds defrauded from Victim 11 were applied to these invoices.

| PHASE ONE VICTIMS | | | |
|---|---|---|---|
| **Initials** | **Designator** | **Proceeds to Gallery** | **Applied to Defendant Property Invoices** |
| JM | Victim 2 | $199,500 | $149,500 |
| MH | Victim 11 | $93,000 | $93,000 |
| | | **$292,500** | **$242,500** |

**Table 2**

*Phase Two Victim Funds Deposited Directly to Gallery Account*

23.     Ten romance fraud victims (Phase 2), identified in **Table 3**, deposited cashier's checks they received from Phase 1 Victims, purchased new cashier's checks payable to the Gallery, and deposited the new checks into the Gallery account.

| PHASE TWO VICTIMS | | |
|---|---|---|
| **Initials** | **Designator** | **Proceeds to Gallery** |
| RG | Alpha | $107,500 |
| AS | Bravo | $39,100 |
| RT | Charlie | $86,400 |
| SyH | Delta | $20,000 |
| DW | Echo | $125,700 |
| LE | Foxtrot | $24,900 |
| KT | Golf | $66,600 |
| TH | Hotel | $47,000 |
| GB | Indigo | $193,200 |
| JW | Juliet | $59,400 |
| | | **$769,800** |

**Table 3**

//

Verified Complaint for Forfeiture *in Rem* - 6
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Total Victim Cashier's Checks Deposited Directly to the Gallery Account*

24.     The makers of the cashier's checks deposited to the Gallery account and applied to invoices for the purchase of the Defendant Property are depicted in **Table 4**.

| CASHIER'S CHECKS DEPOSITED TO GALLERY ACCOUNT | | | |
|---|---|---|---|
| **Initials** | **Phase** | **Designator** | **Deposited** |
| JM | 1 | Victim 2 | $149,500 |
| MH | 1 | Victim 11 | $93,000 |
| RG | 2 | Alpha | $107,500 |
| AS | 2 | Bravo | $39,100 |
| RT | 2 | Charlie | $86,400 |
| SyH | 2 | Delta | $20,000 |
| DW | 2 | Echo | $125,700 |
| LE | 2 | Foxtrot | $24,900 |
| KT | 2 | Golf | $66,600 |
| TH | 2 | Hotel | $47,000 |
| GB | 2 | Indigo | $193,200 |
| JW | 2 | Juliet | $59,400 |
| | | | **$1,012,300** |

**Table 4**

*Fraud Proceeds Applied to Invoices*

25.     **Table 5** depicts the identified proceeds defrauded from victims that were applied to each invoice for the Defendant Property.

| FRAUD PROCEEDS APPLIED TO INVOICES | | | |
|---|---|---|---|
| **Invoice** | **Total Invoice** | **Fraud Proceeds Applied** | **% of Fraud Proceeds v. Total Invoice** |
| 33942 | $73,868.00 | $73,868.00 | 100% |
| 33786 | $198,821.00 | $175,043.81 | 88% |
| 33736 | $381,939.00 | $218,057.19 | 57% |
| 33801 | $128,611.00 | $128,611.00 | 100% |
| 33767 | $600,234.00 | $416,720.00 | 69% |
| **TOTAL** | **$1,383,473.00** | **$1,012,300.00** | |

**Table 5**

Verified Complaint for Forfeiture *in Rem* - 7
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Buyer 1 Controlled Which Victim Funds Were Applied to Each Invoice*

26.     Buyer 1 directed the Gallery to apply these fraud proceeds to each of the invoices for the Defendant Property, including the invoices for purchases by Buyer 2 and Buyer 3. An example of one of these communications from Buyer 1 to the Gallery, directing funds deposited by Victim 11 to Invoices 33736 (purchased by Buyer 1) and 33767 (purchased by Buyer 2) appears below:

Dear █████

I hope you are doing well.

Please confirm details of my last email dated 27th July and share the requested statements.

Further, another payment of 93,000 was credited to the account today. Kindly confirm.

Out of the above please split it in this manner -

Invoice 033767 - 54,000
Invoice 033736 - 39,000

Once above figures are applied also share statements of Invoice 033767 & 033736

regards,

P█████

27.     Victim funds were applied to multiple invoices, for the benefit of multiple buyers, consistent with a unified scheme to defraud the victims and disguise the proceeds of that fraud.

//

//

//

//

Verified Complaint for Forfeiture *in Rem* - 8
*United States v. Approximately 149 Lots of Stamps.*

28.    The following tables identify the invoices to which fraud proceeds were applied, arranged by invoice (**Table 6**) and Victim (**Table 7** and **Table 8**).

| Invoice # | Buyer | Phase 1 Victim | Phase 2 Victim |
|---|---|---|---|
| 33767 | Buyer 1 | Victim 1 | Alpha |
| | | Victim 2 | Direct Payment |
| | | Victim 2 | Alpha |
| | | Victim 3 | Alpha |
| | | Victim 5 | Bravo |
| | | Victim 6 | Charlie |
| | | Victim 7 | Delta |
| | | Victim 8 | Echo |
| | | Victim 10 | Foxtrot |
| | | Victim 11 | Direct Payment |
| | | Victim 13 | Golf |
| | | Victim 18 | Golf |
| 33736 | Buyer 2 | Victim 1 | Alpha |
| | | Victim 6 | Charlie |
| | | Victim 9 | Echo |
| | | Victim 11 | Direct Payment |
| | | Victim 14 | Hotel |
| | | Victim 15 | Indigo |
| 33801 | Buyer 2 | Victim 4 | Alpha |
| | | Victim 15 | Indigo |
| | | Victim 16 | Indigo |
| 33786 | Buyer 3 | Victim 2 | Direct Payment |
| | | Victim 7 | Delta |
| | | Victim 8 | Echo |
| | | Victim 14 | Hotel |
| | | Victim 16 | Indigo |
| | | Victim 17 | Juliet |
| 33942 | Buyer 3 | Victim 2 | Direct Payment |
| | | Victim 15 | Indigo |
| | | Victim 16 | Indigo |
| | | Victim 17 | Juliet |

**Table 6**

//

Verified Complaint for Forfeiture *in Rem* - 9
*United States v. Approximately 149 Lots of Stamps.*

| Phase 1 Victim | Invoice # | Buyer Name |
|---|---|---|
| Victim 1 | 33736 | Buyer 2 |
| | 33767 | Buyer 1 |
| Victim 2 | 33767 | Buyer 1 |
| | 33786 | Buyer 3 |
| | 33942 | Buyer 3 |
| Victim 3 | 33767 | Buyer 1 |
| Victim 4 | 33801 | Buyer 2 |
| Victim 5 | 33767 | Buyer 1 |
| Victim 6 | 33736 | Buyer 2 |
| | 33767 | Buyer 1 |
| Victim 7 | 33767 | Buyer 1 |
| | 33786 | Buyer 3 |
| Victim 8 | 33767 | Buyer 1 |
| | 33786 | Buyer 3 |
| Victim 9 | 33736 | Buyer 2 |
| Victim 10 | 33767 | Buyer 1 |
| Victim 11 | 33736 | Buyer 2 |
| | 33767 | Buyer 1 |
| Victim 13 | 33767 | Buyer 1 |
| Victim 14 | 33736 | Buyer 2 |
| | 33786 | Buyer 3 |
| Victim 15 | 33736 | Buyer 2 |
| | 33801 | Buyer 2 |
| | 33942 | Buyer 3 |
| Victim 16 | 33786 | Buyer 3 |
| | 33801 | Buyer 2 |
| | 33942 | Buyer 3 |
| Victim 17 | 33786 | Buyer 3 |
| | 33942 | Buyer 3 |
| Victim 18 | 33767 | Buyer 1 |

**Table 7**

//

Verified Complaint for Forfeiture *in Rem* - 10
*United States v. Approximately 149 Lots of Stamps.*

| Phase 2 Victim | Invoice # | Buyer Name |
|---|---|---|
| Alpha | 33767 | Buyer 1 |
| | 33801 | Buyer 2 |
| | 33736 | Buyer 2 |
| Bravo | 33767 | Buyer 1 |
| Charlie | 33767 | Buyer 1 |
| | 33736 | Buyer 2 |
| Delta | 33767 | Buyer 1 |
| | 33786 | Buyer 3 |
| Echo | 33767 | Buyer 1 |
| | 33736 | Buyer 2 |
| | 33786 | Buyer 3 |
| Foxtrot | 33767 | Buyer 1 |
| Golf | 33767 | Buyer 1 |
| Hotel | 33736 | Buyer 2 |
| | 33786 | Buyer 3 |
| Indigo | 33736 | Buyer 2 |
| | 33801 | Buyer 2 |
| | 33786 | Buyer 3 |
| | 33942 | Buyer 3 |
| Juliet | 33786 | Buyer 3 |
| | 33942 | Buyer 3 |

**Table 8**

29.    The perpetrators of this fraud scheme engaged in sophisticated, many-layered, transactions to conceal and disguise the nature, location, source, ownership, or control of the proceeds defrauded from these victims. They directed victims to obtain cashier's checks, payable either directly to the Gallery and deposited to the Gallery account or payable to other persons, who deposited those checks, purchased additional cashier's checks payable to the Gallery and deposited them to the Gallery account. They directed the Gallery to apply funds from those cashier's checks toward the identified invoices, thus disguising the proceeds of the underlying fraud as legitimate payments

Verified Complaint for Forfeiture *in Rem* - 11
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

against invoices for the purchase of legitimate assets, through a legitimate auction house. Finally, the proceeds were transformed from funds into stamps – the Defendant Property.

## V.    PURPOSE OF FORFEITURE

30.    The purpose of this forfeiture action *in rem* is two-fold. First, forfeiture of the Defendant Property provides a means for the United States to return funds defrauded from victims. Second, forfeiture deters criminal activity by forfeiting and vesting title of the Defendant Property with the United States, so criminals do not keep fruits of crime or property that facilitated or was involved in crime.

## VI.    THE LAW

31.    An individual commits Mail Fraud when, "having devised or intending to devise any scheme or artifice to defraud … [the individual] places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service [or any private or commercial interstate carrier], or takes or receives therefrom, any such matter or thing …." 18 U.S.C. § 1341. Mail Fraud requires the existence of a scheme to defraud, the use of the mails to carry out or attempt to carry out that scheme, and a specific intent to defraud. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as part of the scheme or "a step in the plot." *See Schmuck v. United States*, 489 U.S. 705, 712 (1989); *see also United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000); *United States v. Hubbard*, 96 F.3d 1223, 1228-29 (9th Cir. 1996). Mailings designed to avoid detection or responsibility for a fraudulent scheme, even if sent after the proceeds of the fraud have been obtained, are sufficient if they are sent prior to the scheme's completion. *See United States v. Tanke*, 743 F.3d 1296, 1305 (9th Cir. 2014). Success of the scheme is immaterial. *See United States v. Rude*, 88 F.3d 1538, 1547 (9th Cir. 1996).

32.    Pursuant to 18 U.S.C. § 1349, it is unlawful to attempt or conspire to commit a violation of 18 U.S.C. § 1341.

Verified Complaint for Forfeiture *in Rem* - 12
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     An individual commits Wire Fraud when, "having devised or intending to devise any scheme or artifice to defraud… [the individual] transmits or causes to be transmitted by means of wire…communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Wire Fraud requires the existence of a scheme to defraud, the use of a wire to further that scheme, and a specific intent to defraud. *See United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011). A wire communication is "in furtherance" of a fraudulent scheme if it is "incident to the execution of the scheme." *See United States v. Jinian*, 725 F.3d 954, 960, citing *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000).

34.     Pursuant to 18 U.S.C. § 1349, it is unlawful to attempt or conspire to commit a violation of 18 U.S.C. § 1343.

35.     An individual commits Conspiracy to Commit Mail Fraud or Wire Fraud when the individual enters into an agreement between two or more persons to commit Mail Fraud or Wire Fraud, knowing of at least one object of the conspiracy, and intending to help accomplish it. *See* 18 U.S.C. § 1349. A "conspiracy" is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership from criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member. No overt act is required by Section 1349. *See United States v. Shabani*, 513 U.S. 10, 12 (1994); *see also United States v Ehmer*, 87 F.4th 1073, 1115 (9th Cir. 2023), citing *United States v. Thompson*, 990 F.3d 680, 683-84 (9th Cir. 2021) (holding that an indictment's inclusion of unnecessary allegations of "overt acts" in charging a wire-fraud conspiracy offense under 18 U.S.C. § 1349 did not mean that the indictment should be construed as instead relying on the general conspiracy statute, 18 U.S.C. § 371, which (unlike § 1349) requires an overt act).

36.     Mail Fraud, Conspiracy to Commit Mail Fraud, Wire Fraud, and Conspiracy to Commit Wire Fraud, are "specified unlawful activities" pursuant to 18 U.S.C. § 1961(1)(B).

37.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting a 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense" is subject to forfeiture to the United States.

38.     A person commits Money Laundering in violation of 18 U.S.C. § 1956(a)(1) when the person knowingly conducts, or attempts to conduct, a financial transaction with proceeds from specified unlawful activity, with intent to promote the specified unlawful activity or evade taxes, or knowing the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds or to avoid transaction reporting requirements. *See* 18 U.S.C. § 1956.

39.     A person commits Money Laundering in violation of 18 U.S.C. § 1957 when the person engages, or attempts to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, through, or to a financial institution. 18 U.S.C. § 1957.

40.     A person commits Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h) when the person joins an agreement to commit Money Laundering, knowing the object of the agreement, and with the intent to further its unlawful purpose. *See* 18 U.S.C. § 1956(h); *see also United States v. Jaimez*, 45 F.4th 1118, 1123 (9th Cir. 2022). No overt act is required by Section 1956(h). *See Whitfield v. United States*, 543 U.S. 209, 219 (2005).

41.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [a federal money laundering offense, 18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

Verified Complaint for Forfeiture *in Rem* - 14
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VII.   SCHEME TO DEFRAUD AND FINANCIAL TRACING

42.     This case involves fraud perpetrated on victims across the United States, including in the Western District of Washington, in which the perpetrators convinced victims to transfer their funds, or the funds of other victims, to the Gallery for the benefit of persons located in India. The victims are deceived into making the financial transfers through various methods, including law enforcement impersonation fraud (Phase 1) and romance fraud (Phase 2).

43.     The law enforcement impersonation fraud generally started with a phone call from someone pretending to be a government employee. The prospective victim was informed that their personal information had been compromised and that they had to protect their funds by sending them to secure locations. The law enforcement impersonator falsely led the victim to believe their funds would be returned once everything was resolved. In this case, the perpetrators of the fraud primarily impersonated FBI, FTC, and DOJ employees. Some victims (Victims 2 and 11) sent cashier's checks in their own names for deposit directly to the Gallery account (Phase 1). Other victims (Victims 1-10, 12-18) purchased a cashier's check in their own names, payable to a second person, and sent the check to that person (Phase 1). The second person deposited the check, purchased a new cashier's check in their name, payable to the Gallery, and sent the new cashier's check for deposit in the Gallery account (Phase 2). The individuals engaging in the Phase 2 activities were typically romance fraud victims.

44.     The romance fraud generally started when a victim met a scammer online. After building rapport and trust with the victim, the scammer convinced the victim to transfer funds, at the direction of the scammer or a purported associate, allegedly to help pay debts owed by the scammer, or to move funds for investment or inheritance purposes. The scammer typically falsely led the victim to believe they were assisting with legitimate money transfers, rather than helping launder funds defrauded from victims of the law enforcement impersonation fraud.

Verified Complaint for Forfeiture *in Rem* - 15
*United States v. Approximately 149 Lots of Stamps.*

45.     The perpetrators engaged in layered financial transactions designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, or control of the proceeds. Many of these transactions involved more than $10,000 of fraud proceeds.

46.     This Complaint does not include all of the financial analysis performed, but focuses on the tracing of specific funds from victims into the Defendant Property, to demonstrate the concerted efforts to launder and obfuscate the flow of victim funds to the perpetrators of the fraud.

*Victim 1 and Alpha*

47.     Victim 1, a resident of Western Washington, received a call from a person who identified himself as Mark [Last Name Unknown] ("Mark"). Mark said that he was an FBI employee and informed Victim 1 that one of their financial accounts had been compromised. Mark instructed Victim 1 to send all of their money to Mark for safe-keeping, for about five to 10 days.

48.     Mark also informed Victim 1 that funds in another account were also at risk, so Victim 1 needed to transfer the money from that account to Mark as well, so he could monitor the funds. Mark instructed Victim 1 to buy a cashier's check for $300,000, payable to Alpha. On or about August 3, 2023, Victim 1 purchased the cashier's check and mailed it to Alpha, as instructed.

*Alpha*

49.     Alpha resides in Georgia and is one of the romance fraud victims. Alpha opened accounts at financial institutions, deposited cashier's checks sent by law enforcement imposter fraud (Phase 1) Victims 1-4 into these accounts, purchased new cashier's checks payable to the Gallery, and deposited them to the Gallery account. Alpha used accounts at multiple financial institutions for this purpose.

//

//

Verified Complaint for Forfeiture *in Rem* - 16
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

50.     Alpha met someone using the name Stella Brooks ("Brooks"), on an online dating app. Alpha and Brooks only communicated through the dating app and on Google Chat. Alpha never met Brooks in person, but Alpha believed they were in love and would get married.

51.     Brooks told Alpha that she used to live in the United States, but she currently lives in Ghana, Africa. In the fall of 2022, Brooks told Alpha that her father died, and she would be the beneficiary of a large gold inheritance. Brooks said that Alpha would also benefit from the gold once they got married.

52.     Brooks introduced Alpha to someone who used the name Arnold Peiffer ("Peiffer"), who Alpha believed was Brooks' attorney. In turn, Peiffer introduced Alpha to someone claiming to be Scott Ardolf ("Ardolf"), the investment advisor overseeing Brooks' gold inheritance. Alpha never met Peiffer or Ardolf in person. Ardolf used the same phone number ("the scam phone") that was used to contact at least five victims of romance fraud: Alpha, Echo, Foxtrot, Golf, and Hotel.

53.     Ardolf instructed Alpha to pick up cashier's checks delivered to a local UPS Store, deposit them, and purchase new cashier's checks. Ardolf instructed Alpha to either mail the cashier's checks to others or to deposit them into a bank account. Ardolf led Alpha to believe the funds were coming from gold investors, and that everyone would eventually be repaid.

54.     Alpha opened an account ending x2325 at one financial institution on or about August 4, 2023 ("Alpha's x2325 account"), into which Alpha made a deposit of $100. The next deposit to this account was the $300,000 cashier's check purchased by Victim 1. There were debits from, but no other deposits to, Alpha's x2325 account before August 21, 2023, when Alpha purchased a $27,000 cashier's check, payable to the Gallery. The funds Alpha used to purchase this cashier's check were defrauded from Victim 1. $5,580 of the funds from the $27,000 cashier's check were applied to Invoice 33736 (Buyer 2) and $21,420 were applied to Invoice 33767 (Buyer 1).

*Victim 2 and Alpha*

55.     Victim 2 is a resident of Maryland. On July 24, 2023, Victim 2 purchased a cashier's check in the amount of $199,500.15, payable to the Gallery, after falling victim to the law enforcement impersonation fraud. A perpetrator or perpetrators pretending to be government officials convinced Victim 2 that their private information had been compromised, they needed to deposit money in a secure location (the Gallery), and they would receive the money back after receiving a new social security number.

56.     $149,500.00 of Victim 2's $199,500.16 cashier's check was applied to the following invoices: $24,600 to Invoice 33942 (Buyer 3); $64,900 to Invoice 33786 (Buyer 3); and $60,000 to Invoice 33767 (Buyer 2). All of these funds are proceeds defrauded from Victim 2. The remaining $50,000 was applied to an invoice associated with a different purchase.

57.     On or about June 14, 2023, Victim 2 purchased a $35,000 cashier's check and sent it to Alpha. Alpha deposited that check into an account ending x8216, in a different financial institution ("Alpha's x8216 account") and, on July 11, 2023, purchased a $45,500 cashier's check payable to the Gallery from Alpha's x8216 account, which was applied to Invoice 33767 (Buyer 2). Approximately $421.23 of the funds used to purchase the $45,500 cashier's check were defrauded from Victim 2. The remaining $45,078.77 was defrauded from Victim 3, as described below.

*Victim 3 and Alpha*

58.     Victim 3, a resident of New York, received a telephone call from someone identifying himself as Michael [Last Name Unknown] ("Michael"). Michael instructed Victim 3 to make out a check for $46,300 to pay what they owed and mail it to Alpha, or Victim 3 would be arrested. Victim 3 purchased a $46,300 cashier's check and mailed it to Alpha.

59.     On June 14, 2023, when Alpha's x8216 account held only $100, Victim 2's $35,000 cashier's check (discussed above in paragraph 57) was deposited into the

Verified Complaint for Forfeiture *in Rem* - 18
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

account. The next transaction was a June 23, 2023 purchase of a $34,400 cashier's check payable to a third party. Between June 26, 2023 and June 27, 2023, Alpha made five retail purchases for a total of $278.77. After these purchases, the balance in Alpha's x8216 account, comprised of the remaining funds from Victim 2, was $421.23.

60.     On June 29, 2023, when Alpha's x8216 account balance was still $421.23, Victim 3's $46,300 cashier's check was deposited to the account. Between June 29, 2023 and July 11, 2023, the only other deposit into the account was a $1.49 interest payment. On July 11, 2023, Alpha purchased a $45,500 cashier's check payable to the Gallery.

61.     The entire $45,500 was applied to Invoice 33767 (Buyer 1). This $45,500 cashier's check was purchased with funds defrauded from Victim 2 ($421.23) and Victim 3 ($45,078.77).

62.     Buyer 1 reminded the Gallery to apply the $45,500 payment in an email message sent on July 18, 2023:

On Tue, 18 Jul 2023 at 8:23 PM, ███████████████████ > wrote:
Dear ████████

The invoice which you have sent me, you have not applied 45,500 which was sent on 12th July. Please check my email of 12th July

Please update the same and resend the invoice.

Regards,

████████

### Victim 4 and Alpha

63.     Victim 4, a resident of Louisiana, received a call from someone purporting to be from a major retail company, claiming that someone was attempting to make a large purchase using Victim 4's card. This person transferred Victim 4 to someone claiming to be Alan Fitch, in the Federal Trade Commission's (FTC) financial crimes unit ("Fitch").

64.     Fitch told Victim 4 that they were being investigated because their SSN was found in a house in Albany, New York, along with eight fraud accounts in their name. Fitch said that Homeland Security would be pressing charges against Victim 4,

Verified Complaint for Forfeiture *in Rem* - 19
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

including conspiracy against America for money laundering, fraud, and terrorism. Fitch told Victim 4 that they would try to change their SSN, but in the meantime, Victim 4 needed to send some of the funds in their bank account for safe-keeping at the FTC while the government determined what was happening. Victim 4 was assured the funds would be returned. Victim 4 purchased a $45,900 cashier's check and sent it to Alpha.

65.     Alpha deposited Victim 4's $45,900 cashier's check into Alpha's x8216 account on or about September 8, 2023. Between the deposit of Victim 3's check on June 29, 2023 and the deposit of Victim 4's check on September 8, 2023, Alpha's x8216 account never reached $0.00 and only received two deposits, which consisted of two interest payments totaling $1.33. Prior to the deposit of Victim 4's check, the balance in Alpha's x8216 account was $94.22. Subsequently, Alpha made one retail purchase and, on September 13, 2023, purchased an official check for $35,000, payable to the Gallery. The official check, which was purchased with at least $34,905 defrauded from Victim 4, was applied to Invoice 33801 (Buyer 2).

**Victim 5 and Bravo**

66.     Victim 5 is a resident of West Virginia. Victim 5 was contacted by someone purporting to be from the fraud department of a financial institution, then transferred to someone claiming to be the Chief Investigator of the FTC. The purported FTC investigator informed Victim 5 their SSN was tied to child pornography rings and they needed to send a cashier's check for $39,800 to Bravo, in New Mexico. On June 6, 2023, after sending the cashier's check to Bravo, Victim 5 received an email message that appeared to be from the Department of the Treasury, informing them that the funds would be returned once the FTC's investigation was concluded.

67.     Bravo is a resident of New Mexico. Bravo opened an account at a financial institution on or about May 24, 2023 and deposited $50. The next transaction was the May 26, 2023 deposit of Victim 5's $39,800 cashier's check. The next transactions occurred on June 9, 2023: the withdrawal of $400 and the purchase of a $39,100 cashier's

Verified Complaint for Forfeiture *in Rem* - 20
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

check, payable to the Gallery. The $39,100 cashier's check was purchased entirely from funds defrauded from Victim 5. On June 12, 2023, the $39,100 cashier's check was deposited into the Gallery's financial account and applied to Invoice 33767 (Buyer 1).

68.     On June 13, 2023, Buyer 1 informed the Gallery that this check had been deposited and directed the Gallery to apply the funds to Invoice 33767. The Gallery confirmed:



Verified Complaint for Forfeiture *in Rem* - 21
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Victim 6 and Charlie*

69.     Victim 6, a resident of California, was contacted by a perpetrator or perpetrators claiming their personal and banking information had been compromised and they needed to protect their money by buying gift cards. Shortly thereafter, Victim 6 was contacted by another person, who confirmed that Victim 6's money needed protecting, but said that they should send cashier's checks via UPS to different individuals. Victim 6 was deceived into believing this money would be stored in lockers and returned once their information was no longer compromised. On June 27, 2023, at the perpetrator's direction, Victim 6 purchased a cashier's check in the amount of $271,000, payable to an LLC associated with Charlie, and sent it to Charlie, in Colorado. Several months later Victim 6 purchased a $293,400 cashier's check, also payable to Charlie.

70.     Charlie, a resident of Colorado, is a victim of romance fraud. Charlie was contacted by a perpetrator who told Charlie she inherited a large amount of property in a foreign country, but needed to pay for fees, taxes, and shipping to bring the property to the United States. She told Charlie that investors would pay these expenses, by sending money to Charlie. She introduced Charlie to Scott [Last Name Unknown] ("Scott"), who provided directions to Charlie concerning these payments. Scott opened a financial account for Charlie in the name of the LLC. Charlie picked up cashier's checks they believed to be investor funds from a UPS store, and deposited them into various bank accounts, at Scott's direction. One of these cashier's checks was Victim 6's $271,000 cashier's check. Charlie deposited Victim 6's check into the LLC account, then purchased an $86,000 cashier's check, payable to the Gallery. All of the funds used to purchase the cashier's check to the Gallery are proceeds defrauded from Victim 6. $50,000 of the funds from this cashier's check were applied to Invoice 33736 (Buyer 2) and $36,400 was applied to Invoice 33767 (Buyer 1).

//

//

71.     Charlie has facilitated payments for the individual Charlie met online for about six years. These payments total approximately $1,500,000. Charlie also sent approximately $8,000 of Charlie's own money at this individual's direction.

**Victim 7 and Delta**

72.     Delta is a resident of Illinois, who was contacted on social media by a person using the name Irene Lawson ("Lawson"). Lawson asked Delta to receive money on her behalf and then make payments to others, using cashier's checks, to pay off Lawson's father's debt. Sometimes Lawson made threats of physical violence to coerce Delta into executing the money transfers. On June 28, 2023, when the balance in Delta's account was $5.45, Delta deposited a cashier's check for $22,100, purchased by Victim 7. Victim 7 is a resident of Oklahoma. The next two transactions in Delta's account happened on June 30, 2023: a withdrawal of $2,000 and a dividend of $0.53.

73.     On July 12, 2023, Delta purchased an official check for $20,000, payable to the Gallery. There were no intervening transactions in Delta's account, so the official check was purchased with funds from Victim 7's cashier's check. $17,900 of these funds were allocated to Invoice 33767 (Buyer 1) and $2,100 of the funds were allocated to Invoice 33786 (Buyer 3).

**Victim 8, Victim 9, and Echo**

74.     Victim 8, a resident of Louisiana, was contacted by someone purporting to be from the FBI, who said the FBI just raided a residence in New Jersey, where Victim 8's personal information was found. Victim 8 was informed that a group was going to steal their money and, to keep it safe, Victim 8 needed to send their money to the person purporting to be from the FBI. On or about May 16, 2023, Victim 8 purchased and mailed a $144,900 cashier's check, payable to Echo. On or about June 6, 2023, Victim 8 purchased and mailed a $169,200 cashier's check, also payable to Echo.

75.     Victim 9 is a resident of Pennsylvania. Victim 9 was contacted in or around July 2023 by someone purporting to be a local police chief, who told them there was an

Verified Complaint for Forfeiture *in Rem* - 23
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

arrest warrant out for money laundering, and Victim 9 needed to send money at the direction of the local police chief. Victim 9 also received calls from people claiming to be representatives of the FBI and FTC. As directed, Victim 9 sent funds to what they believed were government accounts in their name, which would be returned once it was determined that their money was not involved in money laundering. On July 24, 2023, Victim 9 purchased a $28,000 cashier's check, payable to Echo and sent it to Echo.

76.    Echo, a resident of North Carolina, is a romance fraud victim. Echo met someone online who said her name was Nicole ("Nicole"). Through Nicole, Echo was introduced to someone who claimed to be Scott Ardous ["Ardous"], an employee at a law firm helping with Nicole's trust account. Ardous contacted Echo using the scam phone number also used to contact Alpha, Foxtrot, Golf, and Hotel. Ardous told Echo that Nicole's trust account was funded by an inheritance from Nicole's father but that Nicole could not access the inheritance until taxes and other fees were paid.

77.    Echo received and sent funds at the direction of Ardous.

    a.    On June 7, 2023, Echo deposited the $169,200 official check purchased by Victim 8. Immediately prior, the balance in Echo's account was $108.37. On June 16, 2023, when the balance in the account was $168,602, entirely comprised of funds from Victim 8's check, Echo purchased a $98,000 official check, payable to the Gallery. $50,900 of these funds were allocated to Invoice 33767 (Buyer 1); $47,100 of the funds were allocated to Invoice 33786 (Buyer 3).

    b.    On July 27, 2023, Echo deposited Victim 9's $28,000 cashier's check into one of Echo's bank accounts. The balance in Echo's account immediately before this deposit was $3.02, the source of which is unknown. Between this deposit and August 7, 2023, Echo's account received five credits:  a direct deposit from the Social Security Administration for $2,491.00 and four ATM fee refunds totaling $11.50. There were also 17 debits to the account. Sixteen were retail transactions, ATM withdrawals, and one check for $800; these withdrawals totaled $2,343.05. The remaining withdrawal

Verified Complaint for Forfeiture *in Rem* - 24
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

on August 7, 2023 was for the purchase of a $19,000 official check, payable to the Gallery. On August 8, 2023, Echo purchased a second official check for $8,700, also payable to the Gallery. Approximately $17,861.87 of the funds Echo used to purchase the first official check and all of the funds used to purchase the second official check were defrauded from Victim 9. All of these funds were applied to Invoice 33736 (Buyer 2).

***Victim 10 and Foxtrot***

78.    In June or July of 2023, Victim 10, a resident of Montana, received a call from someone claiming to be David Smith ("Smith"), who directed Victim 10 to send money to a trust account. Smith told Victim 10 the money would later be reimbursed. In August 2023, Victim 10 sent a $25,800 cashier's check to Foxtrot.

79.    Foxtrot, a resident of Arizona, met someone online who used the name Carla MacBrown ("MacBrown"). MacBrown told Foxtrot that she was opening a business and she needed help receiving her inheritance money so she could get it started. MacBrown told Foxtrot that she could not receive the inheritance proceeds because of a loan that she had to pay off, so she asked Foxtrot to receive the inheritance proceeds on her behalf. MacBrown put Foxtrot in contact with someone claiming to be Argos Scott ("Argos"), who would help Foxtrot make the transfers. Argos contacted Foxtrot using the same scam phone number used to contact Alpha, Echo, Golf, and Hotel. The "inheritance checks" Foxtrot received included Victim 10's $25,800 cashier's check. Argos instructed Foxtrot to deposit Victim 10's check and send the proceeds to the Gallery.

80.    Foxtrot opened a bank account on August 3, 2023. The first transaction was deposit of Victim 10's check on August 14, 2023. On August 21, 2023, Foxtrot purchased a $19,000 cashier's check, payable to the Gallery. The following day, Foxtrot purchased a $5,900 cashier's check payable to the Gallery. Foxtrot's account received no credits during this period other than the Victim 10's check. The value of both checks ($24,900), all of which was defrauded from Victim 10, was applied to Invoice 33767 (Buyer 1).

Verified Complaint for Forfeiture *in Rem* - 25
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Victim 11*

81.     Victim 11, a resident of West Virginia, purchased a cashier's check in the amount of $93,000 payable to the Gallery. This cashier's check was deposited into a Gallery account. At Buyer 1's direction, $39,000 of the funds were applied to Invoice 33736 (Buyer 2) and $54,000 was applied to Invoice 33767 (Buyer 1). An image of Buyer 1's email directing application of these funds appears below:

Dear █████████

I hope you are doing well.

Please confirm details of my last email dated 27th July and share the requested statements.

Further, another payment of 93,000 was credited to the account today. Kindly confirm.

Out of the above please split it in this manner -

Invoice 033767 - 54,000
Invoice 033736 - 39,000

Once above figures are applied also share statements of Invoice 033767 & 033736

regards,

P██████

*Victim 12, Victim 13, and Golf*

82.     Golf, a resident of Florida, met someone using the name Janet Hilson ("Hilson") on a dating app. Golf and Hilson communicated using phone calls and text messages. Hilson informed Golf that she needed help receiving inheritance from her grandmother, Frieda Achgley ("Achgley"). Achgley left her property to Hilson, and Hilson's financier, Scott Adolf ("Adolf") was funding renovations on the property that Hilson inherited from Achgley. Adolf texted Golf about when funds should be expected, and provided direction to Golf concerning where to send the funds. Adolf used the same scam phone number to contact Golf that was used to contact Alpha, Echo, Foxtrot, and Hotel. Golf also used CashApp to send Bitcoin to Hilson, but primarily handled cashier's checks.

Verified Complaint for Forfeiture *in Rem* - 26
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

83.     Golf opened a financial account at Bank 1, into which Golf deposited cashier's checks received from Victim 12, Victim 13, and others, during the period in which Golf conducted financial transactions at Adolf's direction.

84.     On June 7, 2023, when the balance in Golf's Bank 1 account was $669.17, Golf deposited a $47,000 official check purchased by Victim 12. On June 12, 2023, when the balance on the account was $47,669.17, Golf purchased a $46,500 cashier's check to a third party, using the existing $669.17 and approximately $45,830.83 from Victim 12's cashier's check. The remaining $1,169.17 in Golf's Bank 1 account consisted of funds defrauded from Victim 12. Golf conducted these transactions at the direction of Adolf. Victim 12 has not been located, but is believed to be a victim because they sent three cashier's checks payable to Echo and Golf, funds from which were then used to purchase cashier's checks to the Gallery and other companies.

85.     Victim 13, a resident of Louisiana, was contacted by someone claiming to be in the FBI, who told Victim 13 that their bank accounts and accounts held by their family members might be at risk. The purported FBI agent instructed Victim 13 to send $22,000 to Florida to help with the investigation. On June 29, 2023, Victim 13 purchased and mailed a $22,000 cashier's check payable to Golf.

86.     On July 3, 2023, Golf deposited Victim 13's $22,000 cashier's check in Bank 1. Immediately prior to this deposit, the balance in Golf's Bank 1 account was $714.29, which consisted of funds defrauded from Victim 12. In the interim period, Golf withdrew funds from the account, but made no other deposits.

87.     On July 10, 2023, when the balance in Golf's Bank 1 account was $22,614.29, Golf purchased a $21,600 cashier's check, payable to the Gallery. There were no intervening deposits, so the cashier's check was purchased with approximately $20,885.71 of funds defrauded from Victim 13 and approximately $714.29 of funds defrauded from Victim 12. The full $21,600 was applied to Invoice 33767 (Buyer 1).

Verified Complaint for Forfeiture *in Rem* - 27
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

88.     Golf also opened a financial account at Bank 2, in which he deposited cashier's checks from Victim 12, Victim 18, and others.

89.     On June 20, 2023, when the balance in Golf's Bank 2 was $200, Golf deposited a $34,632 cashier's check purchased by Victim 12. Between then and July 12, 2023, Golf purchased a $33,810 cashier's check (payable to a third party), and made three withdrawals, totaling $300. After these transactions, approximately $722 remained in the Bank 2 account, all of which was derived from Victim 12's cashier's check. On July 19, 2023, Golf deposited an $18,000 cashier's check from another individual. On July 24, 2023, Golf made a cash deposit of $1,800. On August 2, 2023, Golf purchased a $17,700 cashier's check (payable to a third party).

90.     On August 10, 2023, the balance in Golf's Bank 2 account was $891.79, approximately $722 of which was derived from Victim 12's cashier's check. The same day, Golf deposited a $45,530 cashier's check purchased by Victim 18. On August 21, 2023, Golf purchased two cashier's checks payable to the Gallery, totaling $45,000, using the remaining funds from Victim 12 and the new funds from Victim 18. The funds from these two cashier's checks were applied to Invoice 33767 (Buyer 1).

### Victim 14 and Hotel

91.     Victim 14 is a resident of Kentucky. Victim 14 sent a cashier's check to Hotel, after receiving a telephone call from someone claiming that Victim 14's personal information was being used by criminals. Victim 14 was instructed to send their money somewhere, which would be returned after the case was settled. On or about August 16, 2023, Victim 14 purchased an official check in the amount of $70,210, payable to Hotel.

92.     Hotel, a resident of South Carolina, met a woman online who called herself Tina Blankenship ("Blankenship"). Blankenship told Hotel that she inherited approximately $9 million in gold, but needed help to obtain it. Hotel was then contacted by Scott Ardolf ("Ardolf"), using the same scam phone number used to contact Alpha, Echo, Foxtrot, and Golf. Ardolf told Hotel he was assisting Blankenship. Ardolf directed

Verified Complaint for Forfeiture *in Rem* - 28
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Hotel to open checking accounts at approximately seven specific banks and instructed Hotel to deposit checks sent to Hotel into those accounts. Ardolf said the checks were to help pay Blankenship's bills, including attorney's fees, so she could receive her inheritance. Among the individuals who sent checks to Hotel were Victim 14, Victim 16, and Indigo. Adolf also directed Hotel to open a business and obtain a checking account for the business.

93.     Hotel opened one of these bank accounts on or about August 14, 2023 and deposited $10. The next transaction in this account was the deposit, on August 22, 2023, of the $70,210 official check purchased by Victim 14. On August 31, 2023, Hotel purchased an official check in the amount of $47,000, payable to the Gallery. This official check was purchased with approximately $46,990 of funds defrauded from Victim 14, plus the $10 existing in Hotel's account. $32,222 of the funds were applied to Invoice 33736 (Buyer 2) and $14,778 was applied to Invoice 33786 (Buyer 3).

*Victim 15 and Indigo*

94.     Victim 15 is a resident of Tennessee. On or about May 12, 2023, Victim 15 purchased a cashier's check in the amount of $151,000, payable to Indigo. Indigo is a resident of Colorado. On May 15, 2023, Indigo deposited Victim 15's $151,000 cashier's check. Between May 15, 2023 and June 5, 2023, Indigo made withdrawals totaling $151,149.76, bringing the balance on the account down to $150.24. There were no deposits to the account during this period.

95.     On June 9, 2023, when the balance in Indigo's account remained $150.24, Indigo deposited a $290,000 cashier's check, purchased by Victim 15 on June 5, 2023. The same day, Indigo made a withdrawal of $49.99. No further deposits or withdrawals occurred between until June 23, 2023, when Indigo made two withdrawals, totaling $135,358. On June 26, 2023, Indigo purchased a cashier's check in the amount of $152,500, payable to the Gallery. The June 26, 2023 cashier's check was purchased entirely with funds defrauded from Victim 15.

Verified Complaint for Forfeiture *in Rem* - 29
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

96.     Buyer 1 informed the Gallery of the $152,500 payment and directed application of $44,665.92 of the funds to Invoice 33736:



97.     On July 3, 2023, Buyer 1 directed the Gallery to apply $24,639.31 of the funds to Invoice 33942:

Verified Complaint for Forfeiture *in Rem* - 30
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

98.    Buyer 1 provided additional direction for application of the remaining

funds from the $152,000 cashier's check on July 5 and 10, 2023:

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent:    Wednesday, July 5, 2023 9:26 AM
To: ▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮
Subject:    Re: Payment Confirmation Inv 033736 & Inv 033786 Sale 1286


***EXTERNAL EMAIL***

Dear ▮▮▮▮,

I hope you received my email of 3rd July 2023.

I had asked the following -

1. Please share the statement for Invoice 033767.
2. Please use the amount 24,639.31 from the available balance to pay the first installment of invoice 033942.

Kindly confirm the above points.

Finally, use the balance to settle Invoice 33801 (first installment 64,305.50) This will leave the final balance of
18,889.27 with you. Kindly hold onto the balance for now.


regards,

▮▮▮▮▮

---

From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent:    Monday, July 10, 2023 9:32 AM
To: ▮▮▮▮▮▮
Cc:
Subject:    Re: Payment Confirmation Inv 033736 & Inv 033786 Sale 1286


***EXTERNAL EMAIL***

Dear ▮▮▮▮,

I hope you are back to work. Please confirm the mail below and all its points.

The Final balance 18,889.27 out of the total 152,500 kindly be adjusted towards Invoice 033736.

Please note that a payment of 49,000 was sent on Saturday and should have been credited in the account by now.
Please adjust it against Second Installment of Invoice No. 033767.

Kindly confirm overall.

regards,

▮▮▮▮▮

99.    As directed, the Gallery applied the funds from the $152,500 cashier's

check to Invoice 33736 ($63,555.19, made up of $44,665.92 and $18,889.27),

Invoice 33801 ($64,305.50), and Invoice 33942 ($24,639.31).

Verified Complaint for Forfeiture *in Rem* - 31
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Victim 16 and Indigo*

100.     Victim 16, a resident of Virginia, received a call on or around July 6, 2023 from someone claiming to be Sarah Jones ("Jones"), an employee at a financial institution. Jones told Victim 16 that their checking account had been breached and transferred Victim 16 to someone claiming to be Eric Morison ("Morison"), from the FTC. Morison informed Victim 16 that their investment accounts were in jeopardy, and they needed to liquidate their investments and transfer those funds into a new bank account Morison instructed Victim 16 to open.

101.     Around the end of July 2023, Morison put Victim 16 in touch with someone claiming to be FBI employee Jason Gonzales ("Gonzales"). Victim 16's first contact with Gonzales was on a three-way call with Morison. After the first call, Gonzales became Victim 16's main contact. Gonzales continued to instruct Victim 16 to liquidate investments and deposit the proceeds into the new bank account and to another account Gonzales instructed Victim 16 to open at a different bank. Gonzales said Victim 16's money was in danger and it needed to be under the supervision of the federal government for protection.

102.     Gonzales instructed Victim 16 to purchase cashier's checks payable to various construction companies and mail them to addresses in Colorado and South Carolina using overnight USPS mail. As directed by Gonzales, Victim 16 bought a cashier's check for $93,000 on July 31, 2023, payable to a company controlled by Indigo, located in Colorado. On August 25, 2023, Victim 16 bought another cashier's check for $120,000, also payable to a company controlled by Indigo.

103.     Indigo opened an account at US Bank on June 27, 2023 with a cash deposit of $300. On August 3, 2023, when the balance on the account was $200, Indigo deposited the $93,000 cashier's check purchased by Victim 16. Between August 3, 2023 and August 28, 2023, there were five withdrawals from Indigo's account, totaling $92,896, and no other deposits.

Verified Complaint for Forfeiture *in Rem* - 32
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

104.    On August 29, 2023, when the account's balance was $304.00, Indigo deposited the $120,000 cashier's check purchased by Victim 16. This deposit brought the balance on the account to $120,304.00, all of which was defrauded from Victim 16. There were no additional deposits to the account prior to Indigo's purchase of a $40,700 cashier's check, payable to the Gallery. All of the funds used to purchase this cashier's check were defrauded from Victim 16. $11,122.81 of these funds were allocated to Invoice 33786 (Buyer 3); $29,305.50 was allocated to Invoice 33801 (Buyer 2); and $271.69 was allocated to Invoice 33942 (Buyer 1).

***Victim 17 and Juliet***

105.    Victim 17 is a resident of Indiana. On or about August 28, 2023, Victim 17 purchased a $60,000 cashier's check, payable to Juliet. Juliet is a resident of Michigan. Juliet deposited Victim 17's cashier's check on August 30, 2023, eight days after opening a new bank account. The next two transactions in the account were the purchase of a cashier's check on September 5, 2023 for $45,000 and the purchase of a cashier's check on September 6, 2023 for $14,400, both payable to the Gallery. $24,357 of these funds were applied to Invoice 33942 (Buyer 3) and $35,043 was applied to Invoice 33786 (Buyer 3). All of the funds were defrauded from Victim 17.

***Other Payments Applied to These Five Invoices***

106.    Not all payments applied to these five invoices for the purchase of the Defendant Property have been identified as fraud proceeds. Money orders, with little identifying information regarding purchasers, were deposited to the Gallery account and applied to these invoices. Other payments appear to have been made toward the same invoices on behalf of the Buyers, which were made using bank transfers, which generally referenced individual invoice numbers, instead of cashier's checks. All identified victim funds were deposited directly to the Gallery account in the form of cashier's checks. The cashier's checks did not contain references to invoices.

//

Verified Complaint for Forfeiture *in Rem* - 33
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Seizure of the Defendant Property*

107.    On or about February 1, 2024, the FBI executed a properly authorized forfeiture seizure warrant on the Gallery and seized the Defendant Property.

## X.    CLAIM FOR RELIEF

108.    As required by Supplemental Rule G(2)(f), the facts set forth in this Verified Complaint support a reasonable belief that the United States will be able to meet its burden of proof at trial. More specifically, there is probable cause to believe that the Defendant Property is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds of Mail Fraud, in violation of 18 U.S.C. § 1341, Wire Fraud, in violation of 18 U.S.C. § 1343, and Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349, and pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property involved in Money Laundering and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

//

//

//

//

//

//

//

Verified Complaint for Forfeiture *in Rem* - 34
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

WHEREFORE, the United States respectfully requests:

1.      A warrant be issued for the arrest of the Defendant Property;

2.      Due notice be given to all interested parties to appear and show cause why the Defendant Property should not be forfeited;

3.      Judgment be entered declaring the Defendant Property be condemned and forfeited to the United States for disposition according to law; and,

4.      The United States be granted such other and further relief as this Court may deem just and proper.


DATED this 24th day of June, 2024.


Respectfully submitted,

TESSA M. GORMAN
United States Attorney


*s/Krista K. Bush*
KRISTA K. BUSH
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-2242
Fax: (206) 553-6934
Krista.Bush@usdoj.gov

Verified Complaint for Forfeiture *in Rem* - 35
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VERIFICATION

I, Andrew Cropcho, am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and have been since May of 2018. I am currently assigned to the Seattle Field Office. My primary duties include investigating violations of federal law, including corporate fraud, securities fraud, government program fraud, and healthcare fraud. Those duties include investigating instances of wire fraud being used for financial gain at the expense of others, and the laundering of those gains to conceal the true source and nature from which they were derived. Before my career as an FBI Special Agent, I was employed by a large public accounting firm for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

In the scope of my duties as an FBI Special Agent, within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, I am authorized to request the issuance of a federal seizure warrant.

I am an investigating or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal offenses. I furnished the investigative facts contained in the foregoing Verified Complaint for Forfeiture *In Rem*. The investigative facts are based on personal knowledge I obtained from my involvement in the underlying

//

//

//

Verified Complaint for Forfeiture *in Rem* - 36
*United States v. Approximately 149 Lots of Stamps.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

investigation, my review of the relevant investigative material, other federal agencies and law enforcement officers involved in the investigation, other reliable official Government sources, and my own training and experience.

I hereby verify and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Forfeiture *In Rem*, that I know its contents, and that the facts it contains are true and correct to the best of my knowledge.

Executed this 24th day of June, 2024.

ANDREW CROPCHO
Special Agent
Federal Bureau of Investigation

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970